STOCKMEN'S LIVESTOCK EXCHANGE; Kist Livestock Auction; Western Livestock Co., Inc.; Jane Myers, individually, and as Executrix of the Estate of James Myers, Plaintiffs and Appellees,

v.

Ted THOMPSON, Tommy Thompson, Thompson Livestock Company and St. Onge Livestock Auction, Inc., Defendants and Appellants.

Nos. 18356, 18357, 18358 and 18360.

Supreme Court of South Dakota.

Considered on Briefs April 28, 1994.

Decided Aug. 3, 1994.

Haven L. Stuck and Steven Oberg, of Lynn, Jackson, Shultz & Lebrun, Rapid City, for plaintiffs and appellees.

Thomas W. Stanton of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, for defendants and appellants.

PER CURIAM.

Tommy Thompson and Ted Thompson own Thompson Livestock Company and St. Onge Livestock Auction, Inc. (hereinafter, the collective defendants will be referred to as "Thompsons"). Tommy and Ted Thompson are residents of South Dakota. During the time in question, Thompson Livestock Company was a South Dakota partnership and St. Onge Livestock was a South Dakota corporation.

In July of 1987, shortly after establishing St. Onge Livestock Auction, Thompsons hired Darrell Nickelson to manage the feedlot associated with the auction. Nickelson's job also involved traveling to solicit and purchase cattle for Thompson Livestock to be sold at the auction.

In August of 1987, Thompsons applied for and received a North Dakota livestock dealer's license. They designated Nickelson as a bonded agent under their license. For the remainder of 1987, Nickelson traveled for Thompsons through western South Dakota, eastern Wyoming, eastern Montana, and western North Dakota. Thompsons supplied a vehicle and reimbursed Nickelson for his travel expenses. During this period, Nickelson purchased cattle for Thompsons. The form of the transactions varied: sometimes Nickelson would purchase cattle using Thompsons' name up front; other times, he would use his own name or the name Aladdin Ranch. Nickelson was also purchasing cattle for himself and Thompsons were aware of that fact.

In May 1988, Thompsons renewed their North Dakota livestock dealer's license. They again designated Nickelson as their bonded agent. *Nickelson never applied for or held his own livestock dealer's license for North Dakota.*

In July 1988, Nickelson contacted James Myers and Ray Gress and told them he

wanted to purchase cattle. Myers and Gress were licensed livestock dealers in North Dakota. On July 26 and 27, 1988, Myers purchased cattle for Nickelson at the Rugby Livestock Auction and the Minot Livestock Auction. On July 26, 27, and 30, 1988, Gress purchased cattle for Nickelson at the Western Livestock Co, Inc., Kist Livestock Yard, and the Stockmen's Livestock Exchange.

Nickelson mailed a check ($33,346.73) to James Myers to cover all of the cattle he purchased at Rugby and Minot. The check was later returned for insufficient funds. Nickelson mailed checks directly to Western Livestock ($31,687.37), Kist Livestock ($34,-091.84) and Stockmen's Livestock ($33,-747.82), to pay for the cattle Gress had purchased. Each of the checks was returned for insufficient funds.

In August 1988, Thompson Livestock sent notice to the North Dakota Department of Agriculture specifying that Nickelson was no longer their agent. Because the livestock sellers had still not received payment for the cattle, they filed a complaint with the North Dakota Department of Agriculture against Thompsons (as North Dakota licensed livestock dealers and Nickelson's principals). The N.D. Department of Agriculture held that a livestock dealer is strictly liable for the acts of a designated agent. Thompsons' North Dakota livestock dealer's license was revoked. The North Dakota Department of Agriculture was affirmed by the North Dakota Supreme Court. *Thompson v. N.D. Dept. of Agriculture,* 482 N.W.2d 861 (N.D.1992).

Nickelson was unable to pay the livestock sellers for the cattle. He eventually entered into a settlement agreement with them, in which he promised to make payment and also promised to acquire and maintain a life insurance policy to guarantee the payment. Nickelson is not a party to any of the cases on appeal before this Court.

In July 1991, each of the livestock sellers filed a lawsuit against Thompsons. In March 1993, the trial court entered summary judg-

ment in favor of each livestock seller against the Thompsons. Thompsons appeal.

Western Livestock Co., Kist Livestock Auction, Stockmen's Livestock Exchange, and Estate of James Myers all present the identical arguments on appeal. Those four cases are addressed in this opinion. Hereinafter, we will refer to these four parties as "livestock sellers." The appeals of Baker Livestock Auction and Ray Gress are addressed in separate opinions. *See Baker v. Thompson,* 520 N.W.2d 263 (S.D.1994) and *Gress v. Thompson,* 520 N.W.2d 260 (S.D. 1994).

## THE TRIAL COURT CORRECTLY CONCLUDED THAT NORTH DAKOTA LAW GOVERNED THE QUESTION OF THE EXTENT OF THOMPSONS' LIABILITY FOR THE ACT OF THEIR AGENT, NICKELSON.

The trial court held that North Dakota's law applied to determine the extent of Thompsons' liability for the acts of their agent. Thompsons argue that South Dakota law should have governed because the agency relationship was created in South Dakota.

South Dakota applies the provisions of the Restatement (Second) of Conflict of Laws (hereinafter "Restatement") in order to resolve questions about which state's laws govern in a particular factual situation. *Chambers v. Dakotah Charter, Inc.,* 488 N.W.2d 63 (S.D.1992). According to the Restatement, "An agency relationship can give rise to three choice-of-law problems: namely, what law should be applied to determine the rights and duties as between (1) the principal and agent, (2) the principal and some third person on account of one or more acts by the agent, and (3) the agent and the third person." Restatement (Second) Conflict of Laws § 291, comment a.

Thompsons focus on the question of which state's laws apply to determine whether there was an agency between Thompsons and Nickelson. The question of which state's law to apply to determine whether there was an agency relationship is dealt with in Section 291 of the Restatement.[1] **However,**

---

1. Restatement section 291 discusses the relationship *between the principal and the agent.* It provides:

The rights and duties of a principal and agent toward each other are determined by the local law of the state which, with respect to the

**there was no dispute in this case that Nickelson was Thompsons' agent.**

The question in this case involves the extent of Thompsons' responsibility to third parties for the acts of their agent, Nickelson. The question of which state's laws should be applied to determine the rights and duties as between the principal and a third party is dealt with in Restatement Section 292.

Restatement Section 292 provides:

(1) Whether a principal is bound by action taken on his behalf by an agent in dealing with a third person is determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction under the principles stated in § 6.

(2) The principal will be held bound by the agent's action if he would so be bound under the local law of the state where the agent dealt with the third person, provided at least that the principal had authorized the agent to act on his behalf in that state or had led the third person reasonably to believe that the agent had such authority.

Restatement (Second) Conflict of Laws § 292.

Section 6 referenced therein provides:

When there is no [statutory] directive [on choice of law], the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

particular issue, has the most significant relationship to the parties and the transaction un-

(g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6.

Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue. Restatement (Second) of Conflict of Laws § 145 (1971).

*Chambers,* 488 N.W.2d at 68.

The trial court analyzed the situation and determined that the law of North Dakota applied to determine the extent of Thompsons' liability for the actions of their agent. We agree. Nickelson was an agent of the Thompsons and was specifically and officially authorized to act for them in North Dakota. Nickelson contacted livestock dealers in North Dakota and asked them to purchase cattle in North Dakota. Those livestock dealers purchased cattle in North Dakota and the cattle were transported from North Dakota to South Dakota. Nickelson mailed checks from South Dakota to the sellers in North Dakota. Admittedly, neither Nickelson nor Thompsons left South Dakota in relation to these transactions. On the other hand, the North Dakota livestock dealers and the North Dakota livestock sellers never left North Dakota.

The transactions were predominantly focused in North Dakota. The livestock, the livestock sellers, and the livestock dealers were in North Dakota. Nickelson was the only factor in or related to South Dakota. Even that factor is minimized because Nickelson called the livestock brokers in North Dakota.

der principles stated in § 6. This law is selected by application of the rules in §§ 187–188.

Moreover, applying the considerations outlined in Restatement section 6 also point to the application of North Dakota law. As we will discuss later in this opinion, North Dakota has a statutory provision which makes all livestock dealers strictly liable for the acts of their designated agents. Clearly, North Dakota has adopted a special policy to protect livestock sellers in situations like those underlying these lawsuits. No similar policy consideration has been identified to advocate the application of South Dakota law to this situation. Because of that statute, North Dakota livestock sellers have a justified expectation that principals will be held strictly liable for their agent's acts. If we applied South Dakota law, we might defeat those justified expectations.

The trial court was correct in concluding that North Dakota bore the "most significant relationship to the parties and the transaction."

## THE TRIAL COURT WAS CORRECT IN CONCLUDING THAT THOMPSONS WERE LIABLE, *UNDER NORTH DAKOTA LAW,* FOR THE ACTS OF THEIR AGENT, NICKELSON.

As noted previously, the trial court correctly concluded that North Dakota law governed the question of the extent to which Thompsons were liable for the acts of their agent.

The trial court reviewed the North Dakota Supreme Court decision in *Thompson v. N.D. Dept. of Agriculture,* 482 N.W.2d 861 (N.D.1992). In that case, the North Dakota Supreme Court held that a licensed livestock dealer in North Dakota is strictly liable for the acts of a designated agent.

■ The South Dakota trial court concluded that the issue of the extent of Thompsons' liability had been decided in that North Dakota case. We agree that the North Dakota Supreme Court decision in that case is determinative of the issues in this case. In North Dakota, all licensed livestock dealers are strictly liable for the acts of their designated agents. *Thompson,* 482 N.W.2d at 863–64.

## THE TRIAL COURT DID NOT COMMIT ERROR BY SETTING DAMAGES BY SUMMARY JUDGMENT.

■ Thompsons argue that the trial court erred in setting damages by summary judgment without consideration as to the value the livestock sellers had received because, pursuant to a settlement agreement, Nickelson named them as beneficiaries of his life insurance policy. The crux of Thompsons' argument is that the livestock sellers *may* reap a double recovery as a result of the trial court's summary judgment. Yet, Thompsons *do not* claim that the livestock sellers have already received any payments from Nickelson which should have reduced their judgments.

Thompsons claim the livestock sellers are entitled to collect their entire amount of the unpaid checks from both Thompsons and Nickelson. This is only partially true. Thompsons are ignoring the terms of the settlement agreement between Nickelson and the livestock sellers. Under that agreement, once the livestock sellers are paid for the unpaid checks, they are no longer entitled to collect from Nickelson's life insurance proceeds. If Thompsons satisfy the judgments by paying the livestock sellers, the livestock sellers get no money from Nickelson's life insurance.

On the other hand, if Nickelson somehow paid the livestock sellers, Thompsons would still be liable under the terms of the trial court's judgments. Since Nickelson was not a party to the actions underlying these appeals, the trial court could not include him in the joint and several liability. Consequently, Thompsons have no right in this action to claim setoff for amounts paid by Nickelson. Thus, the livestock sellers could theoretically recover from both Nickelson and Thompsons. Perhaps the trial court should have added a paragraph to his judgment providing for such an event. However, Thompsons have produced no authority establishing that the trial court's failure to do so was error justifying reversal.

The trial court is affirmed in all respects.

MILLER, C.J., WUEST and SABERS, JJ., and JAMES W. ANDERSON, Circuit Judge, concur.

HENDERSON, J., disqualified.

JAMES W. ANDERSON, Circuit Judge, for AMUNDSON, J., disqualified.